Charles G. Miller, State Bar No. 39272
Michael D. Abraham, State Bar 125633
Kerry L. Duffy, State Bar No. 233160
BARTKO, ZANKEL, BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California  94111
Telephone:     (415) 956-1900
Facsimile:     (415) 956-1152

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for Tamalpais Bank of San Rafael, California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Tamalpais Bank of San Rafael, California,<br><br>Plaintiff,<br><br>v.<br><br>MARK GARWOOD, ALLAN BORTEL, RICHARD SMITH, CAROLYN HORAN, JAMES WILLIAMS, JEFFREY TAPPAN, MICHAEL RICE, and NANCY GRAUTEN,<br><br>Defendants. | No.<br><br>**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff, Federal Deposit Insurance Corporation, as Receiver for Tamalpais Bank ("FDIC-Receiver"), for its complaint states as follows:

## INTRODUCTION

1.    The FDIC-Receiver brings this lawsuit in its capacity as Receiver for Tamalpais Bank of San Rafael, California ("TB" or the "Bank") to recover over $20 million in losses caused by Defendants' tortious conduct in approving 18 commercial real estate ("CRE") loans (the "Loss Transactions")  between April 2007 and  October 2008.  In this lawsuit, the

-1-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  FDIC-Receiver does not seek to collect on outstanding loans, but, rather seeks to collect tort

2  damages from Defendants for negligence, gross negligence and breaches of fiduciary duty.

3        2.     The FDIC-Receiver asserts claims against eight (8) former officers and

4  directors of the Bank ("Defendants") for breach of fiduciary duty, negligence, and gross

5  negligence. One of the defendants, Mark Garwood ("Garwood") was the Chief Executive Officer,

6  President, Chairman of the Board of Directors of the Bank, and a member of the Loan Committee

7  ("LC"). Officer defendants, Nancy Grauten ("Grauten"), Michael Rice ("Rice") and James

8  Williams ("Williams") were officers and members of the LC. Director Defendants are Alan Bortel

9  ("Bortel"), Carolyn Horan ("Horan"), Richard Smith ("Smith"), and William J. Tappan

10  ("Tappan"), who also served as the Board of Director's representative on the LC from January

11  2006 until January 2008.

12        3.     As officers and directors, Defendants had a duty to prudently manage the

13  Bank and make good faith, informed decisions that were in the Bank's best interests. Moreover,

14  Defendants were charged with the responsibility of operating and managing the lending function

15  of the Bank, including ensuring compliance with the Bank's written loan policies and procedures

16  (the "Loan Policy") and banking regulations and laws. By repeatedly ignoring Loan Policy

17  violations and the obvious underwriting deficiencies that were clear on the face of the loan

18  approval materials that Defendants received prior to voting on the Loss Transactions, Defendants

19  completely abdicated their responsibilities to ensure that loans were made in accordance with TB's

20  Loan Policy and safe and sound lending practices.

21        4.     Defendant Rice became Senior Vice President and Chief Lending Officer

22  and a member of the LC in September 2006 and served in those two positions until January 2009.

23  Defendant Grauten became Senior Vice President and Chief Credit Officer in October 2006

24  serving in this capacity through November 2008. She underwrote or supervised the underwriting

25  of many of the eighteen loans that are the subject of this complaint and made recommendations to

26  the LC as to whether loan requests were in the best interest of the Bank. Defendants Garwood,

27  Tappan, Grauten and Williams served on the LC. Defendants Garwood, Bortel, Smith, and

28

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-2-

1   Tappan also served on the Board of Directors.  Defendants were required, among other things, to

2   ensure that the Bank's borrowers were creditworthy, that there was a clear, sufficient, and reliable

3   repayment source, that the pledged collateral was adequate, and that the loans they recommended

4   and/or approved would not result in unreasonable and imprudent risk to the Bank.

5         5.    In gross derogation of the duties that they owed to the Bank to engage in

6   safe and sound practices, Defendants, among other things:

7         (i)    failed to conduct the business and affairs of the Bank to ensure

8   compliance with prudent banking principles;

9         (ii)    improperly approved millions of dollars in poorly underwritten and

10  risky loans;

11        (iii)    improperly recommended and approved loans that violated the

12  Bank's loan policy and applicable federal and state regulations;

13        (iv)    improperly permitted poor underwriting in contravention of the

14  Bank's policies and reasonable industry standards;

15        (v)    extended credit to borrowers who were not creditworthy;

16        (vi)    extended credit based on inadequate information about the financial

17  condition of prospective borrowers and guarantors and without adequately analyzing cash flow and

18  other critical financial information;

19        (vii)    failed to exercise independent judgment when evaluating and

20  approving the subject loans;

21        (viii)    approved and originated speculative commercial real estate loans

22  despite known adverse economic conditions in the applicable California real estate market;

23        (ix)    approved negative debt service coverage loans without properly

24  analyzing whether the borrowers or guarantors had sufficient resources to make up the short-fall;

25  and

26        (x)    created excessive risk by making undue concentration of the Bank's

27  capital in commercial real estate loans, including negative debt service coverage loans.

28

BARTKO ZANKEL BUNZEL
A PROFESSIONAL LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-3-

BARTKO ZANKEL BUNZEL
A LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

6.      By recommending and approving the Loss Transactions despite their numerous flaws, Defendants exposed the Bank to excessive and imprudent risks and thereby breached their fiduciary duties to the Bank and acted with negligence and gross negligence. Defendants' actions and inactions form the basis of their liability and were the direct and proximate cause of over $20 million in damages that TB suffered and the FDIC-Receiver now seeks to recover. Accordingly, the FDIC-Receiver asserts claims for breach of fiduciary duty, negligence, and gross negligence against all Defendants.

## THE PARTIES

7.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation and instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a). On April 16, 2010, the California Department of Financial Institutions ("CDFI") closed TB and appointed the FDIC as Receiver. § 1821(c). The FDIC is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819. Pursuant to 12 U.S.C. §§ 1821(d)(2)(A)(i), the FDIC, by operation of law, succeeded to all rights, titles, powers and privileges of TB, and, among others, the depositors, account holders and stockholders of the Bank. In this action, the FDIC seeks to recover damages resulting from the tortious conduct of the Defendants.

8.      TB was established in 1991 as a state-chartered industrial bank. On January 30, 2009, the Bank converted to a state-chartered commercial bank. On April 16, 2010, the CDFI closed the Bank with $611.5 million in assets. TB was wholly owned by Tamalpais Bancorp, formerly known as Epic Bancorp, a publicly traded one-bank holding company, which filed for Chapter 7 bankruptcy on September 24, 2010.

9.      Garwood joined TB in September 1991 as its Chief Lending Officer. In January 2004, he became President and Co-Chief Executive Officer, a member of the Board of Directors ("Board"), and a member of the LC. In October 2006, he became sole Chief Executive Officer ("CEO") while remaining President. He served in these capacities until the Bank failed. Grauten began working at TB in 1997 as a loan underwriter. She became Senior Vice President

-4-

and Chief Credit Officer ("SVP-CCO") in October 2006 serving in this capacity through November 2008. Thereafter, she was a loan portfolio manager until the Bank failed. She was a member of the LC from October 2006 until the Bank failed.

10. Rice joined TB in January 2004 as the Small Business Administration loan manager. In September 2006, he became Senior Vice President and Chief Lending Officer and a member of the LC. Rice served in these two positions until January 2009.

11. Williams joined TB in March 2008 as Executive Vice President for Marketing and became a member of the LC on April 10, 2008, serving in these capacities until the Bank failed.

12. Bortel served as a director from March 2005 until the Bank closed. Horan and Smith served as directors from December 2003 until the Bank closed. Tappan served as a director from December 2003 until April 2008. Tappan also served as the Board's representative on the LC from January 2006 until January 2008. FDIC-Receiver is informed and believes that defendant Smith died in December 2013. As soon as the appropriate administrator, executor, or successor is ascertained, FDIC will amend this Complaint to so state.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, because actions in which the FDIC is a party are deemed to arise under federal law. 12 U.S.C. §§ 1819(b)(2)(A). This Court has supplemental jurisdiction over the FDIC's state law claims under 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over all the Defendants, who at all relevant times were residents of California and conducted the Bank's business in California. This Court has personal jurisdiction over each of the Defendants pursuant to California Code of Civil Procedure § 410.10.

15. Venue is proper in this district under 28 U.S.C. § 1391(b), because one or more of the Defendants reside in this district and events and/or omissions giving rise to the claims asserted herein occurred in this district.

BARTKOZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-5-

BARTKO ZANKEL BUNZEL
A PROFESSIONAL LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

## FACTUAL ALLEGATIONS

A.   **Background**

16.   For many years, the Bank operated successfully under the leadership of founder and CEO Kit Cole ("Cole").  The Bank had seven full-service branches in Marin County, California, which is 18 miles north of San Francisco.  When Cole resigned in 2006, Garwood succeeded her as CEO, and the Bank's business model changed.

17.   Garwood embarked on an increasingly aggressive high-risk growth strategy focused on multi-family CRE loans primarily in the San Francisco market.  In particular, Garwood viewed borrowers with a negative debt service coverage ratio ("NDSCR") as a strong niche market for Tamalpais and heavily marketed the Bank's NDSCR program to hundreds of mortgage brokers.  Defendants assumed that NDSCR borrowers would be able to pay these loans either by increasing rental income from the collateral property or by reselling the collateral at a profit.

18.   Despite warnings received by Defendants from both the FDIC and the CDFI in examination reports about the risks to the Bank from high concentrations in NDSCR and CRE loans, both NDSCR and CRE lending expanded in 2007 and 2008.  In addition, the Bank's former Chief Financial Officer, Michael Moulton ("Moulton"), warned the Board in a January 2008 report that "the ongoing credit markets upheaval that began in the Summer of 2007" posed a threat to the Bank.  Moulton expressed concern about the effect that "a severe liquidity strain throughout the entire banking system" would have on the Bank's risky loan portfolio, and he recommended increasing reserves to protect the Bank.  No such action was taken.

19.   In the face of these known risks, the Bank's exposure to both types of high-risk loans noted previously increased.  From September 30, 2007 until March 31, 2008, NDSCR loans increased from 44 percent to 57 percent of its total portfolio, and the riskiest of these loans (those with DSCR below 0.59:1)[1] more than doubled, from 13 percent to 27 percent.  The Bank's concentration in NDSCR loans reached a high of 313 percent of its tier 1 capital as of March 31,

---

[1]   This means that the cash flow from the rents generated from the mortgaged property amounts to only 59% or less of the loan payments.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    2009. The Bank's CRE loan concentration reached 963 percent of its tier 1 capital as of March 31,

2    2009.

3        20.    Defendants approved loans based on stale and/or incomplete financial data

4    and collateral valuations, without global cash flow analyses, with no review of rent rolls for

5    multi-family units, and with no analysis of borrowers' or guarantors' ability to repay. Fully 84

6    percent of the dollar amount of delinquent loans found in the FDIC's Report of Examination

7    ("RoE") as of March 31, 2009, had been originated after Garwood became CEO in 2006.

8        21.    Compounding these risks, in 2007 and 2008 Defendants approved 14

9    high-risk, nonstandard loans totaling $42,369,000 to one family and the family's related entities

10   and guarantors (the "Borrower Group"). The Borrower Group, who owned hundreds of rental

11   apartments in San Francisco, had been challenged for the poor condition of their rental units and ill

12   treatment of tenants. At the time Defendants approved these loans, the Borrower Group and

13   entities controlled by them were defendants in a lawsuit brought in 2006 by the San Francisco City

14   Attorney's Office seeking an order to force them to stop their unfair practices.

15       22.    The Borrower Group loans all had high loan-to-value ("LTV") ratios,

16   NDSCR, and low payment start rates with interest-only provisions for the first three to five years

17   of the loan term. Defendants performed no global cash flow analysis on the borrowing entities

18   and/or guarantors for the loans to determine if they had the ability to make up any debt service

19   shortfalls, because they claimed it was impractical or not feasible to do so. In the face of that,

20   prudent lending would have required that the Defendants either decline to make the loan, make a

21   loan in an amount supported by the cash flow on the secured property, or require additional

22   collateral. Defendants did none of those things. Defendants also failed to analyze the rent rolls or

23   financial statements for many of the properties held by the Borrower Group. Defendants

24   calculated LTV ratios for the loans based on market rate rents even though the tenants were paying

25   below market rate rents. Garwood strongly promoted the Borrower Group relationship internally

26   at the Bank at a time when major banks were refusing to do further business with them. In fact, 7

27   of the 14 loans Defendants approved for the Borrower Group refinanced already troubled loans

28                                        -7-

from other banks. In the third and fourth quarters of 2008 and into 2009, TB experienced heavy losses in its loan portfolio, approximately $14 million of which were on Borrower Group loans.

**B.     TB's Loan Policy and Loan Approval Process**

23.     The Bank's July 2006 Loan Policy established guidelines and requirements for commercial loans, including loan documentation, underwriting procedures, LTV ratios, and characteristics of desirable and undesirable loans. It required that loan underwriting include a thorough evaluation of "the five 'Cs' of credit," which were the borrower's character, capacity, capital, collateral, and conditions, as well as documentation of the purpose of the loan, the primary and secondary sources of and plan for repayment, type and source of collateral, and the economic environment. It also required that a written cash flow analysis of the borrower's business and personal financial statements be documented in the credit file.

24.     The Loan Policy had strict LTV limits on apartment buildings as follows: up to and including $1.5 million, 80%, up to and including $3 million, 75%, up to and including $4 million, 70%, and over $4 million, exception only. These LTV limitations were repeatedly violated. The LTV limitations provide an important safeguard against risk of loss to the extent that appraisals accurately set forth the value of the property and values do not substantially decline.

25.     The Tamalpais Board "ha[d] the ultimate responsibility and authority for the general supervision of the affairs of [the Bank], including the loan portfolio." Responsibility for the generation of the loan portfolio rested "primarily with the President/CEO and/or Chief Credit Officer." The President and Chief Credit Officer had lending authority to approve real estate or stock secured loans up to $2 million, the First Vice President and Underwriting Manager had authority up to $1.5 million, and the Vice President and Senior Underwriter had authority up to $1 million. However, "[a]ny loans approved or disapproved by [these officers were to] be submitted to the Loan Committee for review and ratification." The Board had to vote to approve loans exceeding either $4 million or lending limits as well as any unsecured loan exceeding $1 million. Board members typically voted by email after purportedly reviewing loan summaries posted to the Board's website.

BARTKO ZANKEL BUNZEL
A LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-8-

26.    The LC consisted of one non-officer director, the President-CEO, the SVP-CCO, the SVP of Small Business Lending, and the First Vice President and Underwriting Manager.   A quorum consisted of three members, and all actions required the approval of a majority of LC members present.   The LC was required to monitor loan policy compliance and problem loans and to ensure thorough and adequate underwriting procedures.

27.    In a March 31, 2008 Concentration of Credit Report to the Board, the risks in the increase in NDSCR loans below 0.6:1 were noted, and it was stated that steps had been taken to increase NDSCR requirements to a minimum of 0:8:1 as well as reduced maximum LTV requirement by 5%.   Despite this recognition, Defendants continued to approve NDSCR loans below the 0.8:1 minimum and ignored the new maximum LTV requirements.

28.    In July 2008, the Bank revised the Loan Policy.   The 2008 Policy retained the same loan approval process, but did not reinstate Board representation on the LC.   It also replaced the guidelines on concentrations in the prior 2006 Policy with specific concentration limits for a variety of loan types.   For example, CRE loans could not exceed 500 percent of tier 1 capital, and NDSCR loans could not exceed 300 percent of tier 1 capital.   In addition, the new section on "Portfolio Management" contained a new detailed risk rating system, specific qualifications for loan review personnel, loan review criteria, loan file update schedules, and collateral inspection requirements.   Sections were also added for dealing with past-due and delinquent loans and revised criteria for Allowance for Loan and Lease Losses ("ALLL") calculations.

29.    Despite the stricter requirements in the 2008 Loan Policy, the Defendants' loan approval practices did not improve.   In fact, after the 2008 Loan Policy was adopted, Defendants approved two of the Loss Transactions and ignored the concentration limits for CRE loans and NDSCR loans.   By March 31, 2009, CRE loans reached 963 percent of tier 1 capital and NDSCR loans reached 313 percent of tier 1 capital, both of which exceeded the respective 500 percent and 300 percent limits in the 2008 Loan Policy.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

-9-

C.     **The Loss Transactions**

30.     This section focuses on the 18 Loss Transactions, comprised of 14 Borrower Group loans, one out-of-state large residential loan, and three CRE loans, which caused TB over $20 million in losses.

31.     The Defendants recommended and approved these 18 Loss Transactions in violation of the Bank's Loan Policy and in disregard of prudent lending practices.  Among other things, these Defendants were aware or should have been aware that they were recommending and approving the Loss Transactions that had: (1) stale or inadequate financial information and appraisals; (2) excessive LTV ratios; (3) excessive NDSCR; (3) entity borrowers with little or no operating histories and no assets other than the collateral for the loan; (4) borrowers already heavily burdened by existing debt;   and (5) inadequate or no analysis of the borrowers' or guarantors' global cash flow.  Each of these Loss Transactions was entered into at a time when the Defendants knew or should have known that there were increasingly adverse economic conditions in the relevant real estate market and in the face of regulatory and other warnings.

1.     **G. L. Premier Properties ($2.12 Million)**

32.     This loan was made in May 2007 to G.L. Premier Properties (an LLC formed by a relative of the Borrower Group) to purchase an 11 unit apartment building in San Francisco.  The amount of the loan was $2.12 million.  Grauten and Rice approved this loan despite the fact that the LTV was 80%, exceeding TB's cap of 75%, and there was a negative DSCR of 0.58:1, meaning that the rents generated from the apartment building covered only 58% of the debt repayment amount.  No evidence exists that any analysis was done to determine whether the borrower had other assets or income to make up the difference.  In addition, no evidence exists that any cash flow analysis was performed on the guarantor of the loan, a member of the Borrower Group, who was subsequently released from his guaranty in order to avoid any problems with loan to one borrower limits on other loans. As with all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already declining real estate market, that

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    G.L. Properties would be able to pay the loan either by increasing rents, or by reselling the

2    collateral at a profit. Neither occurred and the Bank eventually lost $702,973 on this loan.

3                    **2.    Skyline Investments ($3.1 Million)**

4            33.    This loan was made in October 2007 to Skyline Investments ("Skyline"), a

5    partnership involving a member of the Borrower Group, to purchase an 18 unit apartment building

6    in San Francisco. The amount of the loan was $3.1 million. The NDSCR that was calculated

7    using actual rents was 0.62:1, and even calculated using market rate rents, the NDSCR was still

8    only 0.75:1. No cash flow analysis was performed on Skyline. In fact, underwriting materials for

9    this loan available to the Defendants at the time they approved this state that "[a]t this time, we're

10   unable to detail the cash flow and liabilities for [Skyline]." Nor was any cash flow or other

11   analysis performed on the guarantor. Underwriting materials available to the Defendants at the

12   time they approved this loan state that calculating a "personal [debt to income] ratio" for the

13   guarantor "is not feasible." Despite the 0.62:1 NDSCR, and the lack of any analysis of the

14   repayment capability of either Skyline or the guarantor, Grauten, Rice, Garwood, Tappan, Smith,

15   Horan and Bortel approved this loan. As with all of the loans to this Borrower Group, Defendants

16   apparently assumed, in the face of an already declining real estate market, that Skyline Investments

17   would be able to pay the loan either by increasing rents, or by reselling the collateral at a profit.

18   Neither occurred and the Bank lost $1,008,060.56 on this loan.

19                   **3.    Trophy Properties ($1.88 Million)**

20           34.    This loan was made in November 2007 to Trophy Properties, an LLC

21   involving two members of the Borrower Group, to purchase a 12 unit apartment house in San

22   Francisco. These same two members of the Borrower Group also served as individual guarantors

23   on the loan. The LTV ratio was 80% (again in violation of the TB loan policy cap of 75%) and the

24   NDSCR was just 0.46:1. This was another interest only loan for 5 years. Again, there is no

25   evidence of any cash flow or other financial analysis of either Trophy Properties or the two

26   individual guarantors. Despite the 0.46:1 NDSCR, and the lack of any analysis of the repayment

27   capability of either Trophy Properties or the guarantors, Grauten and Rice approved the loan at the

28                                              -11-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

LC level, and Garwood, Tappan, Smith, Horan and Bortel approved the loans via e-mail after loans were posted on the directors' website after a short perfunctory review. As with all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already declining real estate market, that Trophy Properties would be able to pay the loan either by increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank lost $623,401.83 on this loan.

### 4. Trophy Properties ($2.8 Million)

35.    This loan was made on December 14, 2007 to Trophy Properties to purchase a 15 unit apartment building in San Francisco. This loan was guaranteed by the same two members of the Borrower Group. Underwriting materials for this loan available to the Defendants at the time they approved the loan showed that Trophy Properties had a negative net worth and a net loss for the year 2006. No global cash flow analysis was performed on the guarantors because the underwriter determined that it was "not feasible." The LTV ratio was 80% (in violation of the TB loan policy cap of 75%) and the NDSCR was 0.45:1, and even at market was only 0.54:1. The loan was perfunctorily reviewed and approved by Bortel, Horan, Smith and Tappan via the directors' dedicated website, and approve by email by Garwood, Grauten and Rice. One of the two individual guarantors, a member of the Borrower Group, was released in 2008, ostensibly to skirt loan to one borrower limits. As with all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already declining real estate market, that Trophy would be able to pay the loan either by increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank charged off $928,471 on this loan.

### 5. The Five Trophy Properties VI Loans

36.    Having approved four loans totaling nearly $10 million to individuals and entities of the Borrower Group from May 2007 through December 2007, Defendants proposed a package of seven additional loans totaling $27 million to an entity of the Borrower Group called Trophy Properties VI, LLC ("Trophy VI"). Trophy Properties VI was 50% owned by a trust (Borrower Group Member A served as Trustee) and 50% owned by a Borrower Group trust

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-12-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

(Borrower Group Member B, Trustee).  These loans were sought by the Borrower Group to refinance troubled loans that the Borrower Group had with a large bank.  Another large bank refused to do business with them.  Nonetheless, the Defendants, without looking into any of these red flags, decided to make these loans.  The loans were posted on the director's website for review and approval.  Horan, Smith and Tappan spent very little, if any, time reviewing or discussing these loans and approved all seven loans, some after only a few minutes of being advised they were on the director's website.  Garwood, Grauten and Rice also approved the loans as members of the LC on December 12, 2007.  It was contemplated that participation interests in these loans would be sold to other lenders to avoid the risk of having such a large number of loans to one borrower and possible lending limit restrictions, but Defendants never sold a single participation.  Not all seven loans approved were funded and not all were made to Trophy Properties VI.  However, five loans totaling over $17 million were funded.

A summary of the five loans in this group that were made follows:

a.    **Borrower Group Member A ($4.25 Million)**

37.    This loan was for $4.25 Million to Borrower Group Member A, and was secured by a 13 unit apartment building in San Francisco.  It was conditioned on Borrower Group Member A being removed as a guarantor on the two Trophy Properties loans referenced at paragraphs 34 and 35 above.  This loan was an interest-only loan for the first five years.  Horan, Smith and Tappan approved this loan for $3.7 million in December 2007 as part of the seven loan package.  Garwood, Grauten and Rice as members of the LC then approved the loan on January 23, 2008 in the amount of $4.25 million.    The loan was typical of the loans the Defendants approved for the Borrower Group, and its members and entities.  The LTV was 79%, clearly in violation of the 70% cap for loans up to $4 million in TB's loan policy.  Documents presented to Defendants at the time they approved this loan showed that the NDSCR was 0.46:1, meaning that the rental income from the building at the time the loan was made covered only 46 cents of every dollar of debt repayment requirements.  However, underwriting documents available to Defendants at the time they approved this loan state that no global cash flow analysis on

-13-

BARTKO ZANKEL BUNZEL
A PROFESSIONAL LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    Borrower Group Member A was performed to determine whether this individual had other sources

2    of income or revenue to make up this shortfall, as it was "not feasible." As with all of the loans to

3    this Borrower Group, Defendants apparently assumed, in the face of an already declining real

4    estate market, and the fact that the Borrower Group already had trouble making payments on loans

5    to other large banks, that Borrower Group Member A would be able to pay the loan either by

6    increasing rents, or by reselling the collateral at a profit.   Neither occurred and the Bank lost

7    $1,409,286.02 on this loan.

8                     b.      **Borrower Group Member A ($4.73 Million)**

9           38.     This was a $4.730 million loan to Borrower Group Member A to refinance a

10   loan secured by a 13 unit apartment building in San Francisco.  Horan, Smith and Tappan initially

11   approved this loan in December 2007 as part of the 7 loan package discussed in paragraph 37 for

12   $4.68 million, with a 78% LTV, in violation of the TB loan policy LTV cap of 70% for loans over

13   $4 million.  On January 25, 2008, Garwood, Grauten and Rice as members of the LC approved this

14   loan as a $4.73 million loan to Borrower Group Member A.  The LTV was 79%, again a violation

15   of TB's LTV cap of 70% for loans in excess of $4 million.    The loan was approved on the

16   condition that   Borrower Group Member A be released from his guarantee of the two Trophy

17   Properties loans discussed in paragraphs 34 and 35 above.  Underwriting documents available to

18   the Defendants at the time they approved this loan do not reflect any analysis of the effect of

19   releasing Borrower Group Member A as a guarantor on the Trophy Properties loans.  This loan

20   had interest-only for the first five years.  The NDSCR was 0.39:1, meaning that the rental income

21   from the building at the time the loan was made covered only 39 cents of every dollar of debt

22   repayment requirements.  However, underwriting documents available to Defendants at the time

23   they approved this loan state that no global cash flow analysis on Borrower Group Member A was

24   performed to determine whether this individual had other sources of income or revenue to make up

25   this shortfall, as it was "not feasible." As with all of the loans to this Borrower Group, Defendants

26   apparently assumed, in the face of an already declining real estate market, and the fact that the

27   Borrower Group already had trouble making payments on loans to other large banks, that

28                                                      -14-

1   Borrower Group Member A would be able to pay the loan either by increasing rents, or by

2   reselling the collateral at a profit.   Neither occurred and the Bank lost $1,568,452 on this loan.

3           c.      **Trophy Properties VI ($1 Million)**

4           39.     This was a $1 million loan to Trophy Properties VI, LLC ("Trophy VI") to

5   refinance a loan on a 6 unit apartment building in San Francisco, guaranteed by Borrower Group

6   Member B.  This loan was originally approved at $1.170 million in December 2007.  The $1

7   million loan was presented for approval in January 2008 together with the $4 million loan referred

8   to in sub-paragraph d below with a request for a release of Borrower Group Member B from his

9   guaranty on the G.L. Properties $2.1 Million loan discussed in paragraph 33.   Underwriting

10  documents available to the Defendants at the time they approved this loan do not reflect any

11  analysis of the effect of releasing Borrower Group Member B as a guarantor on the GL Properties

12  loan.  This Trophy VI loan was another 5 year interest only loan, and refinanced a loan from

13  another bank on a 3-story framed building with 6 apartment units located at 137-147 Tiffany

14  Avenue in San Francisco.   The NDSCR was 0.55:1, meaning that the rental income from the

15  building at the time the loan was made covered only 55 cents of every dollar of debt repayment

16  requirements.    However, underwriting documents available to Defendants at the time they

17  approved this loan state that no global cash flow analysis on Borrower Group Member B was

18  performed to determine whether this individual had other sources of income or revenue to make up

19  this shortfall, as it was "not feasible."  As with all of the loans to this Borrower Group, Defendants

20  apparently assumed, in the face of an already declining real estate market, and the fact that the

21  Borrower Group already had trouble making payments on loans to other large banks, that

22  Borrower Group Member B would be able to pay the loan either by increasing rents, or by

23  reselling the collateral at a profit. Neither occurred and the Bank lost $331,597 on this loan.  The

24  defendants who approved the loan were:  Horan, Smith, Tappan, Garwood, and Grauten.

25          d.      **Trophy Properties VI ($4 Million)**

26          40.     This was a $4 million loan to Trophy Properties VI to refinance a loan on an

27  11 unit apartment building in San Francisco, guaranteed by Borrower Group Member B.  This loan

28                                                      -15-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   was originally approved by Horan, Smith and Tappan in December 2007 at $3.94 million after a

2   perfunctory review if any on the Board website, and then approved at $4 million by LC members

3   Garwood, Grauten and Rice.   The LTV for the loan was 80%, which violated TB's LTV cap of

4   70% for loans up to $4 million.   TB's loan policy required an explanation for LTVs in excess of

5   the cap, but the Defendants provided none, a violation of the TB loan policy. The NDSCR for the

6   loan was 0.48:1 and even assuming market rate rents, was only 0.54:1, meaning that the rental

7   income from the building at the time the loan was made covered only 48 cents of every dollar of

8   debt repayment requirements with current rental rates and only 54 cents of every dollar of debt

9   repayment requirements at market rate rents.   However, underwriting documents available to

10  Defendants at the time they approved this loan state that no global cash flow analysis on Borrower

11  Group Member B was performed to determine whether this individual had other sources of income

12  or revenue to make up this shortfall, as it was "not feasible."   As with all of the loans to this

13  Borrower Group, Defendants apparently assumed, in the face of an already declining real estate

14  market, and the fact that the Borrower Group already had trouble making payments on loans to

15  other large banks, that Borrower Group Member B would be able to pay the loan either by

16  increasing rents, or by reselling the collateral at a profit.   Neither occurred and the Bank lost

17  $1,326,386 on this loan.   The Directors and Officers who approved the loan were:   Horan, Smith,

18  Tappan, Garwood, Grauten, and Rice.

19              e.      **Trophy Properties VI ($2.085 Million)**

20              41.      This was a $2.085 million loan to Trophy Properties VI to refinance a loan

21  with another large bank secured by a mixed use building consisting of 20 apartments and

22  2 commercial units in San Francisco.   The loan was guaranteed by Guarantor A, a relative of the

23  Borrower Group.   Bortel, Horan, Smith, Tappan, Rice, Grauten, Garwood and Williams approved

24  this loan in April 2008.   The NDSCR for the loan was 0.61:1, meaning that the rental income from

25  the building at the time the loan was made covered only 61 cents of every dollar of debt repayment

26  requirements.   This violated the .08:1 minimum set by TB in March 2008,   In addition,

27  underwriting documents available to Defendants at the time they approved this loan state that no

28                                        -16-

BARTKO ZANKEL BUNZEL
A LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   global cash flow analysis on Trophy VI or the guarantor  was performed to determine whether

2   Trophy VI or the individual guarantor had other sources of income or revenue to make up this

3   shortfall, as it was "impractical" and "not feasible."  As with all of the loans to this Borrower

4   Group, Defendants apparently assumed, in the face of an already declining real estate market, and

5   the fact that the Borrower Group already had trouble making payments on loans to other large

6   banks, that Trophy VI and the individual guarantor would be able to pay the loan either by

7   increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank lost

8   $691,379 on this loan.

9          **6.      Additional Borrower Group Loans Defendants Approved in 2008**

10         **a.      Prime Apartment Properties ($3.562 Million)**

11         42.      This was a $3.562 million loan to refinance a loan from another large bank

12   on a 31 unit apartment building to Prime Apartment Properties, LLC ("Prime Apartment

13   Properties") guaranteed by Guarantor A.  The loan was funded on April 23, 2008.  It was approved

14   by Garwood, Grauten and Rice.  This also involved a restructure of Prime Apartment Properties by

15   attempting to divest Borrower Group members A and B of any ownership in order to avoid any

16   loan to one borrower restrictions.  The NDSCR was 0.54:1, below the minimum of 0.8:1 required

17   by TB since March 2008.  The LTV ratio was approximately 75% in violation of the 70% cap in

18   TB's Loan Policy for loans up to $4,000,000 and the maximums referred to in the March 2008

19   Concentration Report.  The rental income from the building at the time the loan was made covered

20   only 54 cents of every dollar of debt repayment requirements.  However, underwriting documents

21   available to Defendants at the time they approved this loan state that no global cash flow analysis

22   on Prime Apartment Properties or Guarantor A was performed to determine whether either had

23   other sources of income or revenue to make up this shortfall, as it was "impractical."   No debt to

24   income ratios were calculated for either Prime Apartment Properties or Guarantor A.  As with all

25   of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already

26   declining real estate market, and the fact that the Borrower Group already had trouble making

27   payments on loans to other large banks, that Prime Apartment Properties and Guarantor A would

28

-17-

be able to pay the loan either by increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank lost $1,181,313 on this loan.

### b. Trophy Properties VI ($5.842.5 Million)

43. This was a $5.842.5 million loan to Trophy VI to refinance a loan from another large bank on a building with 36 apartments and 5 retail units in San Francisco. The loan was funded on April 23, 2008. The loan was again guaranteed by Guarantor A. The LTV ratio was approximately 75%, in violation of the loan policy for commercial and residential loans as there was no exception to policy and no apparent attempt to adjust to the maximums referred to in the March 2008 Concentration Report. The NDSCR was 0.61:1, again in violation of the 0.8:1 minimum required by TB since March 2008. The rental income from the building at the time the loan was made covered only 61 cents of every dollar of debt repayment requirements. However, underwriting documents available to Defendants at the time they approved this loan state that no global cash flow analysis on Trophy VI or Guarantor A was performed to determine whether either had other sources of income or revenue to make up this shortfall, as it was "not feasible." For the same reason, no debt-to-income ratios were calculated for either Trophy VI or Guarantor A. As with all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already declining real estate market, and the fact that the Borrower Group already had trouble making payments on loans to other large banks, that Trophy VI and Guarantor A would be able to pay the loan either by increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank lost $1,937,354 on this loan. The Directors and/or Officers who approved the loan were: Horan, Smith, Tappan, Garwood, Grauten, Rice, and Williams.

### c. Trophy Properties V ($3.850 Million)

44. This was a $3.850 million loan to Trophy Properties V, LLC ("Trophy V") to refinance a loan from another large bank on a 12 unit apartment building in San Francisco. The loan was approved by Garwood, Grauten and Williams, and funded in October 2008, well into the throes of a severe real estate market downturn. Trophy V was owned by trusts related to Borrower Group Members A and B. This loan was guaranteed by Borrower Group Member A. The LTV

-18-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY -- Case No.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    ratio was 77% (in violation of TB's loan policy with no mitigating factors noted, and contrary to

2    the Bank's statements in the March 31, 2008 Concentration Report).  This loan required interest

3    only for the first three years.  The NDSCR was 0.53:1 at actual and 0.67:1 at market, below the

4    0.8:1 minimum required by TB's 2008 Loan Policy.  This means that the rental income from the

5    building at the time the loan was made covered only 53 cents of every dollar of debt repayment

6    requirements.    However, underwriting documents available to Defendants at the time they

7    approved this loan state that no global cash flow analysis on Trophy V or Borrower Group

8    Member A was performed to determine whether either had other sources of income or revenue to

9    make up this shortfall, as it was "not feasible."    For the same reason, no debt-to-income ratios

10   were calculated for either Trophy V or Borrower Group Member A.    As with all of the loans to

11   this Borrower Group, Defendants apparently assumed, in the face of an already declining real

12   estate market, and the fact that the Borrower Group already had trouble making payments on loans

13   to other large banks, that Trophy V and Borrower Group Member A would be able to pay the loan

14   either by increasing rents, or by reselling the collateral at a profit. Neither occurred and the Bank

15   lost $528,327 on this loan.

16                    **d.      1400 McAllister LP ($3.112 Million)**

17          45.    This was a $3.112 million loan to purchase an 18 unit apartment building in

18   San Francisco made to 1400 McAllister Street, LP ("1400 McAllister") which was owned in part

19   by Borrower Group Member C.  Garwood, Grauten and Williams approved this loan in April

20   2008.  The loan had a NDSCR of 0.67:1, in violation of the .08:1 minimum required by TB since

21   March 2008.  The rental income from the building at the time the loan was made covered only 67

22   cents of every dollar of debt repayment requirements.  However, underwriting documents available

23   to Defendants at the time they approved this loan do not include any global cash flow analysis on

24   1400 McAllister or any of the four guarantors, who included Borrower Group Member C.  Nor

25   were any income tax returns in the loan file for 1400 McAllister or any of the guarantors.  As with

26   all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already

27   declining real estate market, and the fact that the Borrower Group already had trouble making

28                                              -19-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   payments on loans to other large banks, that 1400 McAllister and Borrower Group Member C

2   would be able to pay the loan either by increasing rents, or by reselling the collateral at a profit.

3   Neither occurred and the lost $233,437.50 on this loan.

4             **e.**    **Borrower Group Members D and E ($2.122 Million)**

5         46.    This was a $2.122 million loan for the purchase of an 18 unit apartment

6   building in San Francisco to Borrower Group Members D and E.  Garwood, Grauten, Rice and

7   Williams approved this loan in May 2008.  It was guaranteed by an individual who was a

8   co-investor with the Borrower Group, but not related to them, and also a co-owner of Skyline

9   Realty, which was related to Skyline Properties.  The NDSCR was 0.71:1, below the 0.8:1

10  minimum required by TB since March 2008  The rental income from the building at the time the

11  loan was made covered only 71 cents of every dollar of debt repayment requirements.  However,

12  underwriting documents available to Defendants at the time they approved this loan do not include

13  any global cash flow analysis on Borrower Group Member D or E, or on the guarantor.  As with

14  all of the loans to this Borrower Group, Defendants apparently assumed, in the face of an already

15  declining real estate market, and the fact that the Borrower Group already had trouble making

16  payments on loans to other large banks, that Borrower Group Members D and E would be able to

17  pay the loan either by increasing rents, or by reselling the collateral at a profit. Neither occurred

18  and the Bank lost $703,814 on this loan.

19            **7.**    **Dixileta ($3.3 Million)**

20        47.    Bortel, Horan, Smith, Tappan, Garwood, Grauten approved this loan to

21  Borrower 1 in May 2007 for $3.3 Million.  The loan had a one year maturity.  Its purported

22  purpose was to complete 20% of the construction of a large custom home in Arizona, outside of

23  the Bank's normal lending area.  The source of repayment was a 12 month interest reserve and

24  Borrower 1's income and assets.  The loan was fully funded at closing except for the interest

25  reserve.  Borrower 1 received the funds except for the interest reserve, and there was no hold back

26  to insure that funds would be used for construction.  Construction on the home was never

27  completed and some of the "construction" funds were actually used to complete a plane hangar on

28  

-20-

the property. Also, Defendants knew prior to closing this loan that the prime asset relied upon by the Bank for repayment source, a trust fund, was not available to Borrower 1. Defendants nevertheless approved the loan, and also ignored the effect of tax liens on Borrower 1's property, which further reduced the assets available to repay the loan. The loss was $2,174,561 on this loan.

### 8. Borrower 2 ($2.08 Million)

48. Bortel, Horan, Smith and Garwood approved this $2.08 million NDSCR loan in June 2007 for the purchase of an office building in San Rafael, which Borrower 2 stated it intended to convert to condominiums. No condominiums were ever built. An interest reserve was set up to be used only to pay construction loan interest, but instead it was used to pay the Bank once it was decided there would be no construction. More importantly, the guarantor was highly leveraged and the interest reserve was improperly set up to cover this underwriting weakness. The NDSCR was 0.72:1. Underwriting was grossly inadequate in that there was no evidence that any attempt was made to evaluate the ability of the Borrower 2 or the guarantors to service the loan. There was no evidence that the Bank had financial information on Borrower 2 prior to the time the loan was made to evaluate its ability to service or partially service the loan from current operating income until the project was complete. While the Bank required monthly monitoring of the loan status and a full review as of December 31, 2008, a 2009 external credit review found "there is no evidence, in file, of any review being perfected." There was no prior approval by the Loan Committee also in violation of Bank policy. The loss was $919,080 on this loan.

### 9. See & Go Properties ($1.750 Million)

49. Grauten approved a $1.750 million Small Business Administration loan to See & Go Properties ("See & Go") in June 2008 to purchase a bed & breakfast inn in downtown Sacramento. Grauten alone approved this NDSCR loan, which violated the Bank's SBA loan policy, which required that the Small Business Lending Manager and the Loan Committee also approve the loan. By the end of 2008, the NDSCR was 0.75:1 and it had fluctuated over the years with the low point at 0.48:1. Underwriting documents available to Grauten at the time she approved this loan contained no analysis of See & Go's cash flow or its financial statements.

-21-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY -- Case No.

Grauten approved the loan based on income projections provided by See & Go, even though the actual income from the inn at the time could only cover 75% percent of the debt repayment requirements and the borrowers had no prior business track record. Moreover, several troubling aspects of the loan were glossed over or disregarded entirely, such as: (i) the Borrowers were "first time innkeepers" with no prior lodging experience, whereas the property was a unique upscale inn and spa in Sacramento that was fairly labor intensive; and (ii) the LTV after junior liens exceeded 100%, far in excess of the 75% cap for these loans in TB's Loan Policy. This loan resulted in a loss of $767,775.80.

### 10. **Wallbridge ($5.4 Million)**

50. Bortel, Horan, Garwood and Grauten approved this $5.4 million loan to Wallbridge, an entity owned by five individual investors, on April 18, 2007, to refinance a large parcel of land, with some of the proceeds to be used to purchase an adjacent parcel. Defendants approved this loan over the "no" vote of a former TB director, who was concerned about the poor credit history of the borrower. The loan closed under TB's "Quick Close" program, which permitted accelerated loan approval for commercial projects with a low LTV ratio. However, the LTV ratio of 64 percent for the Wallbridge loan was based on an appraisal 8 months old of the combined value of two parcels and dependent upon future favorable zoning changes, which never occurred. The primary repayment source was an interest reserve created from the loan proceeds, which was quickly exhausted. Grauten conditioned her approval of the loan subject on receipt of an environmental report for the property and further analysis of the rezoning prospects, none of which occurred. Yet the loan proceeds were disbursed. The borrowers defaulted on the loan, TB foreclosed on it, and the property was sold for $1.630 Million, resulting in a loss of $3,974,635. The funds should never have been released until the conditions were met and there was no monitoring of compliance with these conditions . The loan proceeds were disbursed based upon a highly speculative evaluation of the property's potential for development, which assumed the developers could obtain a zoning variance, rather than an appraisal "as-is" value as zoned. As

-22-

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  acknowledged by Grauten in a 2009 e-mail, "our 8/06 appraisal at 75 units [was] based on a

2  fantasy density bonus approval" which never materialized.

### CLAIMS FOR RELIEF

### Count I-Ordinary Negligence

### (Against All Defendants)

6        51.    The FDIC-Receiver realleges and incorporates by reference each of the

7  allegations contained in paragraphs 1-50 of this Complaint, as though fully set forth herein.

8        52.    As officers and directors of the Bank, Defendants each owed the Bank a

9  duty of care to exercise the diligence, care, and skill that ordinarily prudent persons would exercise

10  under similar circumstances in the conduct of the Bank's business and financial affairs, including

11  its lending practices.

12        53.    Also, each Defendant agreed and was obligated by statute, contract and/or

13  common law to diligently and honestly administer the affairs of the Bank, and was under a duty to

14  ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all

15  applicable policies, rules and regulations of the Bank.  The Defendants, collectively and

16  individually, owed to the Bank the highest duty of due care and diligence in the management and

17  administration of the affairs of the Bank, in the use and preservation of its assets and property, and

18  in the adoption and carrying out of banking practices that were safe, sound and prudent.

19        54.    Defendants are not entitled to the application of the business judgment rule

20  because none of the Defendants' actions or inactions that are the basis of this negligence claim

21  were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions

22  or inactions because each of the Defendants repeatedly underwrote, recommended and/or approved

23  loans in violation of the Loan Policy, Parts 364 and 365 of the FDIC's Rules and Regulations,

24  and/or the California Financial Code; abdicated their fiduciary obligations; and failed to exercise

25  little or any judgment in approving and making loans.  In addition, the officers are not entitled to

26  invoke the business judgment rule.

27

28

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-23-

55.     As officers and directors of the Bank, Defendants had a duty to ensure that the Bank had adequate policies, procedures and internal controls relating to, among other things, CRE lending; adhered to its lending and credit policies, loan approval processes and loan and credit administration practices; complied with banking statutes and regulations; did not make imprudent loans and extensions of credit; and approved loans in compliance with Bank Loan Policy and prudent and sound lending practices.

56.     With respect to the Loss Transactions that they recommended and/or approved, each of the Defendants owed to the Bank duties that included, but were not limited to, informing himself about the proposed loans and the risk the loans posed to the Bank before recommending or approving the loan; recommending or approving loans that conformed with Bank Loan Policy; ensuring that any loans they recommended or approved were underwritten in a safe and sound manner; ensuring that any loans they recommended or approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; ensuring that any loans they recommended or approved, especially NDSCR loans, would be repaid from sources independent from the collateral at issue; and ensuring that any loans they recommended or approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

57.     As further detailed in this Complaint, Defendants failed to discharge their obligations to the Bank as described herein, breaching the statutory and common law duties that they owed to the Bank; and thus were negligent by, among other things:

        (i)     Failing to analyze and assess the Loss Transactions in good faith and in an informed and deliberate manner;

        (ii)    Failing to follow reasonable and prudent procedures for underwriting and monitoring the Bank's CRE loans;

        (iii)   Causing and/or allowing the Bank to approve and fund loans in violation of the Bank's Loan Policy and applicable regulations;

-24-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

(iv)     Causing and/or allowing the Bank to approve and fund loans based on inadequate or wrongly valued collateral securing the loans;

(v)     Causing and/or allowing the Bank to approve, fund, and renew loans without requiring adequate and reliable sources of repayment;

(vi)     Causing and/or allowing the Bank to approve, and fund loans without adequately analyzing the borrower's or guarantor's ability to perform on the loan and without adequately analyzing the ability of the secured property or the guarantors to support the loan;

(vii)     Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;

(viii)     Failing to inform themselves about the proposed loans and the risks the loans posed to the Bank before they determined whether to recommend or approve them;

(ix)     Recommending and approving the release of individual borrowers or guarantors for inadequate consideration;

(x)     Failing to properly conduct the business and affairs of the Bank to ensure compliance with all applicable laws and regulations, and safe, sound, and prudent principles of banking;

(xi)     Failing to heed the warnings of bank supervisory authorities regarding over-concentrations in Commercial Real Estate ("CRE"), particularly in real estate properties with a negative debt service coverage;

(xii)     Operating with a large volume of poor quality loans;

(xiii)     Creating and allowing excessive exposure of the Bank to CRE loans, particularly negative debt service coverage CRE loans, to one group of affiliated or related borrowers;

(xiv)     Allowing and/or failing to monitor or check the Bank's progressively increasing lending to a related borrower group, manifested in high risk,

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL HALER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-25-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY -- Case No.

non-standard loans, premature releases of guarantors, high loan to value ratios based on inflated appraisal values, and non-standard loan terms;

(xv)   Failing to engage in appropriate cash flow analyses of borrowers, proper due diligence with respect to the ability of borrowers, particularly commercial real estate borrowers in an affiliated group, to repay loans, and failure to collect and analyze the appropriate and necessary financial information, including rent rolls, in connection with such loans; and

(xvi)   Failing to follow adequate real estate appraisal procedures.

58.   Each of the Defendants, during the period of time he or she was an officer of the Bank, was unreasonable in failing to investigate material facts, failing to carry out his or her responsibilities to the Bank by failing to act with appropriate care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances, failing to act in good faith, ignoring the danger his/her negligence was causing to the Bank, negligently underwriting, recommending, and approving loans contrary to safe and sound banking practices, as further described in the Complaint, in connection with the Bank's commercial lending functions. These breaches of duty are exemplified by the Loss Transactions described herein.

## Count II -- Gross Negligence

### (Against All Defendants)

59.   The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1-58 of this Complaint, as though fully set forth herein.

60.   Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  California law defines "gross negligence" as either a want of scant care or an extreme departure from the ordinary standard of care.

61.   As directors and officers, Defendants each owed the Bank a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily

-26-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL LLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  prudent persons in like positions would use similar circumstances.  This duty of care included, but
2  was not limited to, the following:

3        (i)    to inform themselves about proposed loans and the risks the loans
4  posed to the Bank before they recommended or approved them;

5        (ii)   to recommend and approve only those loans that conformed to the
6  Banks' Loan Policy;

7        (iii)  to ensure that any loans they recommended or approved were
8  underwritten in a safe and sound manner;

9        (iv)  to ensure that any loans they underwrote, recommended, or approved
10  were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;
11  and

12        (v)   to ensure that any loans they underwrote, recommended, or approved
13  did not violate applicable banking regulations and/or create unsafe or unsound concentrations of
14  credit.

15      62.    Each of the Defendants, through their gross negligence, breached their
16  duties of care by, among other things:  causing the Bank to make CRE loans without proper
17  analysis of the borrowers' ability to repay; failing to inform himself/herself about or recklessly
18  ignoring the risks that the proposed loans posed to the Bank; recommending or approving loans
19  with terms inconsistent with the Bank's Loan Policy; failing to ensure that loans were underwritten
20  in a safe and sound manner; failing to ensure that the borrowers and guarantors of NDSCR loans
21  had the ability to repay those loans; violating banking regulations and statutes; creating unsafe and
22  unsound concentrations of credit; recommending and approving the release of individual
23  guarantors for inadequate consideration; and, failing to take action to prevent the reoccurrence of
24  unsafe or unsound banking practices that came to his or her attention.

25      63.    In addition, Defendants breached their duties and were grossly negligent in
26  connection with each Loss Transaction they recommended or approved, because they knew or

-27-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    should have known that each such loan involved one or more of the following characteristics,

2    which increased the risk of default:

3            (i)    an excessive LTV ratio, as measured by applicable regulatory

4    standards and TB's own Loan Policy;

5            (iv)    insufficient investigation into whether the borrower or guarantor (or

6    both) have excessive liabilities, or otherwise had the financial wherewithal to service the loan;

7            (v)    relying on out-of-date or inadequate financial statements and/or

8    appraisals without appropriate analysis;

9            (vi)    unduly concentrating the Bank's assets without any adequate

10    investigation into the ability of the guarantors to repay the loan;

11            (vii)    approving and making a large number of commercial real estate

12    loans to interrelated borrowers or guarantors where debt service coverage ratios fell far below

13    1.1:1.

14        64.    Each Defendant was grossly negligent in that his or her manner of carrying

15    out his or her duties and responsibilities to the Bank constituted a want of even scant care or an

16    extreme departure from the ordinary standard of care.  Instead, Defendants acted with such a

17    degree of carelessness and inattention to the performance of their duties as to constitute gross

18    negligence under California law.

19        65.    Defendants' actions and inactions as described in this Complaint were not

20    made in good faith or in an informed and deliberate manner and in abdication of their duties.

21        66.    Defendants have breached their statutory and common law duties owed to

22    the Bank, and as a direct and proximate result of the Defendants' gross negligence, the

23    FDIC-Receiver suffered damages in an amount to be determined at trial, in excess of $20 million.

24                        **Count III -- Breach of Fiduciary Duty**

25                              **(Against All Defendants)**

26        67.    The FDIC-Receiver realleges and incorporates by reference each of the

27    allegations contained in paragraphs 1-66 of this Complaint, as though fully set forth herein.

28                                          -28-

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1

68.     As Bank officers and directors, the Defendants occupied a fiduciary

2 relationship with the Bank and owed the Bank a duty to act with the utmost good faith, honesty,

3 and loyalty in the conduct of the Bank's business, property and financial affairs.

4

69.     By their actions and inactions as described in this Complaint, Defendants

5 violated their respective fiduciary duties to the Bank.  Defendants clearly acted unreasonably under

6 the circumstances known to them at the time, and otherwise wholly abdicated their corporate

7 responsibilities by ignoring known risks, failing to act in good faith and did not act with the belief

8 that their actions were in the best interests of the Bank.  Defendants allowed the Bank's assets to be

9 wasted by recommending and approving the Loss Transactions without adherence to the Bank's

10 Loan Policy and prudent lending practices, and among other things, place the interests of

11 borrowers or guarantors and affiliated persons and entities above the interests of the Bank.

12

70.     As a direct and proximate result of Defendants' breaches of their fiduciary

13 duty to the Bank, the FDIC-Receiver suffered damages in an amount to be determined at trial, in

14 excess of $20 million.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-29-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

### PRAYER FOR RELIEF

71.     WHEREFORE, the FDIC as Receiver for Tamalpais Bank requests the entry of a judgment in its favor and against Defendants as follows:

(i)     an award of damages, jointly and severally, in an amount to be proven at trial;

(ii)    an award of costs and other expenses recoverable in connection with this proceeding;

(iii)   an award of prejudgment and post-judgment interest as allowed by law; and

(iv)    such other and further relief as the Court deems just and proper.

DATED:  January 27, 2014

BARTKO, ZANKEL, BUNZEL & MILLER
A Professional Law Corporation

By: _____
            Charles G. Miller
          Attorneys for Plaintiff
    FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for Tamalpais Bank of
        San Rafael, California

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-30-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 8, the FDIC-Receiver demands a trial by jury on all claims.

DATED:  January 27, 2014

BARTKO, ZANKEL, BUNZEL & MILLER
A Professional Law Corporation

By: _____
Charles G. Miller
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for Tamalpais Bank of
San Rafael, California

-31-

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF
FIDUCIARY DUTY -- Case No.